**ORAL ARGUMENT NOT YET SCHEDULED**
No. 23-7041 (Related Case: No. 23-7044)

# In the United States Court of Appeals for the District of Columbia Circuit

UNITED STATES OF AMERICA EX REL.
MARK J. O'CONNOR AND SARA F. LEIBMAN,

*Plaintiffs-Appellants,*

v.

UNITED STATES CELLULAR CORPORATION, ET AL.,

*Defendants-Appellees.*

Appeal from the U.S. District Court for the District of Columbia
Case No. 20-cv-2070 (Hon. Tanya S. Chutkan, J.)

## BRIEF FOR PLAINTIFFS-APPELLANTS

Sara M. Lord
James R. Wiseman
ARNALL GOLDEN GREGORY, LLP
2100 Pennsylvania Ave. NW
Suite 350S
Washington, DC 20006
(202) 677-4054
sara.lord@agg.com
james.wiseman@agg.com

Benjamin J. Vernia
THE VERNIA LAW FIRM
1455 Pennsylvania Ave. NW
Suite 400
Washington, DC 20004
(202) 349-4053
bvernia@vernialaw.com

Daniel Woofter
GOLDSTEIN, RUSSELL &
  WOOFTER, LLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 240-8433
dhwoofter@goldsteinrussell.com

*Attorneys for Plaintiffs-Appellants Mark J. O'Connor and Sara F. Leibman*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Plaintiffs-Appellants certify as follows:

**(A)    Parties and *amici*.** The defendants in the district court, and the appellees here, are U.S. Cellular Corporation; USCC Wireless Investment, Inc.; Telephone and Data Systems, Inc.; King Street Wireless, LP; King Street, Inc.; Advantage Spectrum, LP; Frequency Advantage, LP; Nonesuch, Inc.; Allison Cryor DiNardo; Sunshine Spectrum, Inc. The plaintiffs/relators in the district court, and appellants here, are Mark J. O'Connor; and Sara F. Leibman.

**(B)    Rulings Under Review.** The rulings under review are the district court's March 31, 2022 memorandum opinion and order granting defendants' motions to dismiss the complaint, *see* Dkt. Nos. 170, 171, published as *United States ex rel. O'Connor v. U.S. Cellular Corp.*, No. 20-cv-2070, 2022 WL 971290 (D.D.C. Mar. 31, 2022) (Chutkan, J.), and the district court's March 9, 2023 memorandum opinion and order granting defendants' motions to dismiss the complaint, *see* Dkt. Nos. 189, 190, published as *United States ex rel. O'Connor v. U.S. Cellular Corp.*, No. 20-cv-2070, 2023 WL 2424605 (D.D.C. Mar. 9, 2023) (Chutkan, J.).

**(C)** **Related Cases**. This case has not been before this or any other court. Related case *United States ex rel. O'Connor v. U.S. Cellular Corp.*, No. 20-cv-2071 (D.D.C.), is on appeal in this Court in No. 23-7044, for which oral argument will be held on the same day before the same panel. *See* Doc. #2008930 (July 21, 2023 Order).

Plaintiffs are not aware of any other related cases pending before this Court, any other U.S. court of appeals, or any local or federal court in the District of Columbia.

Dated: October 2, 2023                    /s/ Daniel Woofter
                                                          Daniel Woofter

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................vi

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION ..........................................................4

ISSUES PRESENTED ........................................................................4

STATUTES AND REGULATIONS ..........................................................5

STATEMENT OF THE CASE ................................................................5

    I.   Legal Background ..................................................................5

        A. False Claims Act and Public Disclosure Bar ..........................5

        B. FCC Designated Entity Program ......................................13

    II.  Allegations in the Amended Complaint ..............................19

        A. Prior to Auction 97, Defendants Engaged in Other Sham
           Designated-Entity Schemes. ............................................21

        B. Advantage Fraudulently Participated as a Designated
           Entity in Auction 97. ....................................................23

        C. Defendants' Post-Licensing Disclosures to the FCC
           Were False and Fraudulent. ............................................26

    III. Procedural History ............................................................29

STANDARD OF REVIEW ....................................................................34

SUMMARY OF ARGUMENT ..............................................................35

ARGUMENT ........................................................................40

    I.   The Public Disclosure Bar Was Not Designed to Compel
       Dismissal of Cases Like This One. ......................................40

    II.  No Qualifying Public Disclosure Occurred. ..........................43

        A. None of the Documents Cited by the District Court was
           Disclosed in an Enumerated Channel. ................................44

        B. The Publicly Available Documents Did Not Disclose
           "Substantially the Same" Frauds Alleged. ............................53

    III. Plaintiffs Are Original Sources. ..........................................59

CONCLUSION ........................................................ 71

ADDENDUM ......................................................... A1

# TABLE OF AUTHORITIES

## Cases

*ASARCO, LLC v. Union Pac. R. Co.*,
  765 F.3d 999 (9th Cir. 2014)................................................................34

*Bowden v. United States*,
  106 F.3d 433 (D.C. Cir. 1997)...........................................................34

*Cook County v. United States ex rel. Chandler*,
  538 U.S. 119 (2003)...............................................................................6

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004).............................................................................50

*Leveski v. ITT Educ. Servs., Inc.*,
  719 F.3d 818 (7th Cir. 2013)..............................................................55

*Maine Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020)........................................................................49

*Northstar Wireless, LLC v. FCC*,
  38 F.4th 190 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2693 (2023)....25

*Ofisi v. BNP Paribas, S.A.*,
  77 F.4th 667 (D.C. Cir. 2023) ...........................................................58

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)............................................................................50

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
  563 U.S. 401 (2011).......................................................7, 49, 51, 52, 55

*Silbersher v. Valeant Pharms. Int'l, Inc.*,
  76 F.4th 843 (9th Cir. 2023) ...................................12, 47, 48, 50, 51, 68

*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017)..........................................................25

*Sturgeon v. Pharmerica Corp.*,
  438 F. Supp. 3d 246 (E.D. Pa. 2020) .................................................55

---

Authorities upon which we chiefly rely are marked with asterisks.

*United Sates ex rel. Springfield Terminal Ry. Co. v. Quinn,
   14 F.3d 645 (D.C. Cir. 1994) ....... 2, 12, 31, 36, 37, 44, 46, 48, 54, 61, 67

United States ex rel. Atkins v. McInteer,
   470 F.3d 1350 (11th Cir. 2006) ........................................................... 64

United States ex rel. Chandler v. Cook County,
   277 F.3d 969 (7th Cir. 2002), aff'd, 538 U.S. 119 (2003) .................... 64

United States ex rel. El-Amin v. George Washington Univ.,
   533 F. Supp. 2d 12 (D.D.C. 2008) ....................................................... 64

United States ex rel. Feingold v. AdminaStar Fed., Inc.,
   324 F.3d 492 (7th Cir. 2003) ................................................................ 54

United States ex rel. Holloway v. Heartland Hospice, Inc.,
   960 F.3d 836 (6th Cir. 2020) ................................................................ 11

United States ex rel. Ibanez v. Bristol-Myers Squibb Co.,
   874 F.3d 905 (6th Cir. 2017) ................................................................ 54

United States ex rel. Joseph v. Cannon,
   642 F.2d 1373 (D.C. Cir. 1981) .............................................................. 6

United States ex rel. Mateski v. Raytheon Co.,
   816 F.3d 565 (9th Cir. 2016) ................................................................ 55

*United States ex rel. Maur v. Hage-Korban,
   981 F.3d 516 (6th Cir. 2020) ................................................................ 65

*United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC,
   812 F.3d 294 (3d Cir. 2016) ....................................................... 9, 64, 66

United States ex rel. Oliver v. Philip Morris USA Inc.,
   826 F.3d 466 (D.C. Cir. 2016) ............................................................. 44

United States ex rel. Prather v. AT&T, Inc.,
   847 F.3d 1097 (9th Cir. 2017) .............................................................. 34

United States ex rel. Rabushka v. Crane Co.,
   40 F.3d 1509 (8th Cir. 1994) ................................................................ 54

*United States ex rel. Rahimi v. Rite Aid Corp.,
   3 F.4th 813 (6th Cir. 2021) .................................................................. 66

*United States ex rel. Reed v. KeyPoint Gov't Sols.,
   923 F.3d 729 (10th Cir. 2019) .............................................. 34, 64, 66, 69

*United States ex rel. Schnupp v. Blair Pharmacy, Inc.*,
　2022 WL 17584381 (D. Md. Dec. 9, 2022)............................................47

*United States ex rel. Spay v. CVS Caremark Corp.*,
　875 F.3d 746 (3d Cir. 2017) ....................................................................7

*\*United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless*, LLC,
　34 F.4th 29 (D.C. Cir. 2022) ...................................................38, 52, 59

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
　827 F.3d 201 (1st Cir. 2016) ...........................................................65, 67

*United States v. Bank of Farmington*,
　166 F.3d 853 (7th Cir. 1999), *overruled on other grounds by Glaser v.
　Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009) .............68

*United States v. Brookdale Senior Living Communities, Inc.*,
　892 F.3d 822 (6th Cir. 2018)................................................................65

## Statutes

28 U.S.C. § 1291....................................................................................4

28 U.S.C. § 1331....................................................................................4

31 U.S.C. § 3729(a)(1)(A)......................................................................5

31 U.S.C. § 3729(a)(1)(B)......................................................................5

31 U.S.C. § 3729(a)(1)(C)......................................................................5

31 U.S.C. § 3729(a)(1)(G)......................................................................5

31 U.S.C. § 3730(b)(1)........................................................................6, 40

31 U.S.C. § 3730(b)(4)............................................................................6

31 U.S.C. § 3730(d)................................................................................6

31 U.S.C. § 3730(e)(4)..........................................................................10

31 U.S.C. § 3730(e)(4)(A) ..........................1, 2, 4, 7, 37, 43, 44, 45, 53, 54

31 U.S.C. § 3730(e)(4)(A) (1986).......................................................7, 46

31 U.S.C. § 3730(e)(4)(A)(i) ....................................................4, 10, 36, 46

31 U.S.C. § 3730(e)(4)(A)(ii) .....................................................4, 11, 49

31 U.S.C. § 3730(e)(4)(A)(iii) ..........................................................4, 45

31 U.S.C. § 3730(e)(4)(B) ........................................................3, 4, 13, 60

31 U.S.C. § 3730(e)(4)(B) (1986)................................................7

31 U.S.C. § 3732................................................................................4

47 U.S.C. § 309(j)(4)(C)..............................................................14

47 U.S.C. § 309(j)(4)(D)..............................................................13

47 U.S.C. § 309(j)(4)(E)...............................................................14

## Regulations

47 C.F.R. § 1.2105............................................................................17

47 C.F.R. § 1.2105(a)(2)(iv).......................................................18

47 C.F.R. § 1.2105(a)(2)(viii)....................................................18

47 C.F.R. § 1.2107(c)......................................................................18

47 C.F.R. § 1.2107(d).....................................................................18

47 C.F.R. § 1.2110............................................................................15

47 C.F.R. § 1.2110(b)(1)...............................................................14

47 C.F.R. § 1.2110(b)(1)(i)...................................................16, 18

47 C.F.R. § 1.2110(b)(1)(i), (j)..................................................18

47 C.F.R. § 1.2110(b)(2)...............................................................14

47 C.F.R. § 1.2110(b)(3)...............................................................14

47 C.F.R. § 1.2110(b)(3)(ii).........................................................19

47 C.F.R. § 1.2110(c)(2)(i)...........................................................16

47 C.F.R. § 1.2110(c)(2)(ii)(H).............................................17, 25

47 C.F.R. § 1.2110(c)(2)(ii)(J)....................................................16

47 C.F.R. § 1.2110(c)(5)(viii)......................................................63

47 C.F.R. § 1.2110(c)(i).................................................................18

47 C.F.R. § 1.2110(j)...............................................................14, 18

47 C.F.R. § 1.2110(n).............................................................14, 19

47 C.F.R. § 1.2111...................................................................14, 15

47 C.F.R. § 1.2111(a)(1)...............................................................14

47 C.F.R. § 1.2111(b)(1)...............................................................19

47 C.F.R. § 1.2112 .................................................................... 15

47 C.F.R. § 1.2112(b)(1)(iii) .................................................... 18

47 C.F.R. § 1.2112(b)(1)(iv) .................................................... 18

47 C.F.R. § 1.2112(b)(2) .......................................................... 17

47 C.F.R. § 1.2114(a) ............................................................... 15

47 C.F.R. § 1.945(c) ................................................................. 47

47 C.F.R. § 1.945(d) ................................................................ 47

47 C.F.R. § 1.945(e) ................................................................. 47

47 C.F.R. § 27.1102(b)(2) ........................................................ 15

47 C.F.R. § 27.14(k) ................................................................. 19

47 C.F.R. § 27.14(s)(1) ............................................................. 19

47 C.F.R. § 27.14(s)(3) ............................................................. 19

47 C.F.R. §§ 1.2105(a)(2)(ii)(B) .............................................. 18

Competitive Bidding Proceeding,
  63 Fed. Reg. 2,315 (Jan. 15, 1998) ...................................... 14

## Rules

Fed. R. App. P. 4(a)(1)(A) ......................................................... 4

Fed. R. Civ. P. 12(b)(6) ......................................................... 3, 34

## FCC Adjudications

*In re Application of Baker Creek Commc'ns, L.P.*,
  13 FCC Rcd. 18709 (Sept. 22, 1998) .................................... 63

*In re Northstar Wireless, LLC,*
  30 FCC Rcd. 8887 (Aug. 18, 2015) ........................................ 25

*In re Northstar Wireless, LLC,*
  35 FCC Rcd. 13317 (Nov. 23, 2020) ...................................... 25

## Other Authorities

145 Cong. Rec. E1546-01 (daily ed. July 14, 1999),
　　1999 WL 495861.............................................8, 9, 40, 41, 42, 43, 68, 69

*Auction of Advanced Wireless Servs. (Aws-3) Licenses 70 Bidders
　　Qualified to Participate in Auction 97*,
　　29 FCC Rcd. 13465 (Oct. 30, 2014).......................................................17

Black's Law Dictionary (11th ed. 2019)......................................47, 48, 51

S. Rep. No. 110-507, at 3 (2008)................................................7, 8, 40, 43

S. Rep. No. 99-345 (1986) ............................................................6, 40, 42

USCC, Annual Report (Form 10-K) 66 (Feb. 25, 2015),
　　https://perma.cc/JR5Q-2ZZ4 ...........................3, 4, 29, 35, 37, 45, 55, 57

# GLOSSARY

DOJ          Department of Justice

FCA          False Claims Act

FCC          Federal Communications Commission

JA           Joint Appendix

SEC          Securities and Exchange Commission

## PUBLIC DISCLOSURES AT ISSUE

1.    Frequency Advantage, L.P. Partnership Agreement
      (https://tinyurl.com/Frequency-Agreement)

2.    Advantage Partnership Agreement
      (https://tinyurl.com/Advantage-Agreement)

3.    Bidding Protocol Agreement
      (https://tinyurl.com/Bidding-Protocol)

4.    2014 Frequency Loan and Security Agreements
      (https://tinyurl.com/Frequency-Loan)

5.    2014 Advantage Loan and Security Agreements
      (https://tinyurl.com/Advantage-Loan)

6.    USCC, Annual Report (Form 10-K) (Feb. 25, 2015)
      (https://perma.cc/JR5Q-2ZZ4)

The Court may find the FCC webpage including Advantage's Form 601 attachments here: https://tinyurl.com/Form-601-Attachments. The district court cited to this page in its 2022 Opinion. [Doc.170_at_10]. As explained below, as far as plaintiffs' counsel is aware, USCC's 2014 Annual Report (Form 10-K) (Feb. 25, 2015), was not filed with the FCC.

## INTRODUCTION

This case and the related case on appeal before this Court in No. 23-7044, arise under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA). Plaintiffs-Appellants—telecommunications attorneys with deep background in telecommunications law—determined through careful analysis of defendants-appellees' submissions to the Federal Communications Commission (FCC), as well as additional sources and independent investigation, that defendants deceived the FCC into granting wireless spectrum licenses at a substantial discount amounting to hundreds of millions of dollars for which they were not eligible, and then, separately, deceived the Government for years to conceal the fraud and avoid having to repay the discounts. Plaintiffs brought an FCA action as *qui tam* relators to help the Government recover these losses.

These appeals concern an affirmative defense, the "public disclosure bar," which generally requires dismissal of FCA actions "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in specific, enumerated forums, "unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A).

1

Courts must determine whether the allegations and transactions have been publicly disclosed through the specific, enumerated channels to be a "public disclosure," and whether that information discloses "substantially the same allegations or transactions" as alleged by the *qui tam* relator. *Ibid.*; *see United Sates ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994). "If—and only if—the answer to the first question is affirmative," will courts "then proceed to the 'original source' inquiry." *Springfield Terminal*, 14 F.3d at 651 (quotation marks omitted).

Thus, if publicly available documents are not a "public disclosure" because they fall outside the statutory channels, that is the end of the inquiry. Or if they are public disclosures, but do not provide "substantially the same allegations or transactions" as those in a relator's complaint, they do not bar the action. If a defendant meets its burden to establish both of those requirements at the first step, there are then two paths to "original source" status for the relator. One path is available to an individual who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and provided

"the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

The district court twice granted defendants' motions to dismiss under Rule 12(b)(6), based solely on the public disclosure bar. According to the district court, (a) five documents submitted to the FCC in an application for benefits, and one publicly available, annual shareholder report, were "public disclosures" of (b) "substantially *similar*" allegations of plaintiffs' allegations of fraud, and (c) plaintiffs do not qualify as an "original source" because, looking only at the nonpublic evidence plaintiffs' investigations uncovered, they did not materially add to the publicly accessible information.

Each of those holdings is wrong, and finding error on any requires reversal. First, applications for benefits and annual shareholder reports are not "public disclosures" within any channel enumerated in the public disclosure bar. Second, even if they were, they did not disclose "substantially the same" allegations of fraud by plaintiffs here. Third, plaintiffs are an original source because they had independent knowledge that materially added to the publicly accessible information.

3

## STATEMENT OF JURISDICTION

The district court had jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331 and 31 U.S.C. § 3732. It entered final judgment in defendants' favor on March 9, 2023. [Docs.189-90]. Plaintiffs timely filed their notice of appeal on April 7, 2023. [Doc.192]; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether applications for benefits filed by private actors with the FCC or Form 10-K annual shareholder reports fall within one of the three enumerated channels of public disclosures under the FCA. *See* 31 U.S.C. § 3730(e)(4)(A)(i)-(iii).

2.     If such benefit applications or shareholder reports are "public disclosures": Whether plaintiffs' allegations are "substantially the same" as the transactions those documents disclosed. *See* 31 U.S.C. § 3730(e)(4)(A).

3.     If the public disclosure bar applies: Whether plaintiffs' independent knowledge "materially adds" to the publicly disclosed transactions such that they may proceed as original sources. *See* 31 U.S.C. § 3730(e)(4)(B).

## STATUTES AND REGULATIONS

Pertinent statutory and regulatory authority is reproduced *infra* pp.A1-A9.

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

### A.    False Claims Act and Public Disclosure Bar

The FCA creates civil liability for "any person" who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"—"(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"—or, in what is known as a reverse false claim, "(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G). The statute also reaches anyone who "conspires to commit a violation" of any of those subparagraphs. *Id.* § 3729(a)(1)(C).

5

In enacting the FCA, "Congress wrote expansively, meaning to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation marks omitted).

The FCA authorizes suits by private persons, known as *qui tam* relators, on the Government's behalf. *See* 31 U.S.C. § 3730(b)(1). After a relator files suit, the Government can intervene, or instead to allow the relator to carry the suit forward. *See id.* § 3730(b)(4). At the end of a successful case, the Government receives the lion's share of the recovery, and the relator up to 30%. *See id.* § 3730(d). The *qui tam* provisions are designed to "encourage any individual knowing of Government fraud to bring that information forward." S. Rep. No. 99-345, at 2 (1986).

Prior to 1986, the statute included a "Government knowledge bar," which precluded *qui tam* suits that were "based upon evidence or information in the possession of the [Government] at the time … suit was brought." *See United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1377 (D.C. Cir. 1981) (quotation marks omitted). The Government knowledge bar "so 'significantly limited the number of FCA cases that were filed' that '[b]y the 1980s, the FCA was no longer a viable tool for combating

fraud against the Government.'" *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 754 (3d Cir. 2017) (quoting S. Rep. No. 110-507, at 3 (2008)).

Congress replaced the "Government knowledge bar" with the "public disclosure bar" in 1986. As originally drafted, the public disclosure bar provided that no court would have "jurisdiction over an action under this section based upon the public disclosure of allegations or transactions" in certain enumerated channels "unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (1986). An "original source" was defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." *Id.* § 3730(e)(4)(B) (1986).

The public disclosure bar seeks "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 413 (2011) (quotation marks and emphasis removed). Consistent

with the purpose of the 1986 amendments, that balance favors enforcement. "In creating both the public disclosure bar and the original source exception," Congress intended "to only bar truly 'parasitic' lawsuits, such as those brought by individuals who did nothing more than copy a criminal indictment filed by the Government." S. Rep. No. 110-507, at 22. Instead, Congress sought "to ensure that any individual *qui tam* relator who came forward with legitimate information that started the Government looking into an area it would otherwise not have looked, could proceed with an FCA case." *Id.* at 5.

Unfortunately, courts misapplied the public disclosure bar to dismiss meritorious cases. This prompted the sponsors of the 1986 Amendments to explain that the public disclosure bar, "which was drafted to deter so-called 'parasitic' cases, has been converted by several circuit courts into a powerful sword by which defendants are able to defeat worthy relators and their claims," in a manner that threatened to undermine "the very purpose" of the 1986 Amendments. 145 Cong. Rec. E1546-01 (daily ed. July 14, 1999), 1999 WL 495861, at *E1546.

In particular, the legislators "disagree[d] with cases holding that *qui tam* suits are barred if the relator obtains some, or even all, of the

information necessary to prove fraud from publicly available documents." 145 Cong. Rec. E1546-01, at *E1547. In their view, a relator "who uses their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a *qui tam* action." *Ibid*. "This is especially true where a relator must piece together facts exposing a fraud from separate documents." *Ibid*. They also disagreed with decisions limiting the original source provision to "eyewitness[es] to the fraudulent conduct as it occurs." *Ibid.* Instead, the sponsors explained that, "[f]or example, a relator who learns of false claims by gathering and comparing data could have direct and independent knowledge of the fraud, regardless of his or her status as a [percipient] witness." *Ibid.*

Accordingly, in 2010, Congress "overhauled" and "radically changed" the statute to "lower the bar for relators." *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 298-99 (3d Cir. 2016). As amended, the public disclosure bar provides that:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or ([ii]) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4).

Three changes are salient here. First, these amendments narrowed the triggers for the bar to apply. Rather than applying when fraud is disclosed in *any* criminal, civil, or administrative hearing, the bar now applies only to Federal hearings, and only if the Government or its agent is a party. *See* 31 U.S.C. § 3730(e)(4)(A)(i). Congress also modified the second channel of disclosure—which previously included any "congressional, administrative, or Government Accounting Office report,

10

hearing, audit, or investigation"—by removing the word "administrative," and adding the phrase "other Federal" before report. *See* 31 U.S.C. § 3730(e)(4)(A)(ii).

Second, instead of triggering the bar whenever the relator's allegations are "based upon" the publicly disclosed allegations or transactions, Congress provided that the publicly disclosed allegations or transactions must be "substantially the same" as those alleged in the complaint. Thus, courts that previously adopted more expansive interpretations of "based upon" have changed course after the 2010 amendments. For example, the Sixth Circuit has recognized that "[f]rom a textual standpoint, 'substantially the same' facially demands a greater degree of similarity between the *qui tam* complaint and the prior disclosures than 'based upon' does." *United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 851 (6th Cir. 2020). Under the amended statute, "there is no textual hook" for an argument that the public disclosure bar is triggered when a complaint is "even partly based upon" public disclosures—as some courts had held under the prior statute. *Ibid.*

Indeed, as this Court explained even before the 2010 amendments narrowed the bar, the public disclosure bar does not apply "when only innocuous or spotty information—insufficient in itself to constitute an allegation of fraud or to reveal the essential elements of a fraudulent transaction—exists in the public domain." *See Springfield Terminal*, 14 F.3d at 657; *see also Silbersher v. Valeant Pharms. Int'l, Inc.*, 76 F.4th 843, 857 (9th Cir. 2023) (no public disclosure when "the scattered qualifying public disclosures each contain a piece of the puzzle, but none shows the full picture," and relator "filled the gaps by putting together the material elements of the allegedly fraudulent scheme").

Third, the definition of "original source" changed substantially. Rather than require relators to have direct and independent knowledge of the information on which the allegations are based, and to provide that information to the Government before suing, the exception now applies: (1) if the relator voluntarily discloses "the information on which allegations or transactions in the claim are based" to the Government before a public disclosure occurs; or (2) if the relator "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and voluntarily communicates that

12

"information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

Under the first path, relators who communicate the information underlying their claims to the Government inoculate themselves from subsequent public disclosures. Under the second path, relators who have independent, material knowledge may proceed if they provide their information to the Government before suing—even if the material elements of the fraud were already publicly disclosed.

## B.    FCC Designated Entity Program

Enabling everything from cellular communications to broadcast television, wireless spectrum is a *finite* public good with extraordinary value. To allocate that important resource fairly, Congress authorized the FCC to auction spectrum licenses and directed it to establish mechanisms that help level the playing field for, among others, small businesses. *See* 47 U.S.C. § 309(j)(4)(D).

To promote the participation of legitimate small businesses in wireless spectrum auctions, the FCC established the "Designated Entity" program, which provides "bidding credits" to small or very small

13

businesses. *See* 47 C.F.R. § 1.2110(b)(3);[1] *see also* 47 U.S.C. § 309(j)(4)(C)-(D). To ensure that bid credits flow to small and very small businesses—and not large companies seeking to game the system—the FCC established strict eligibility requirements to qualify as a designated entity, as well as a five-year "unjust enrichment" period during which, to retain their bid credits, designated entities must continue to meet the eligibility requirements. 47 C.F.R. §§ 1.2110(b)(1)-(3), 1.2111(a)(1); *see also* 47 U.S.C. § 309(j)(4)(E). Thus, designated entities must regularly certify that they satisfy the eligibility requirements—first, in their bidding and licensing applications, and then in "Annual Reports" during the unjust enrichment period. 47 C.F.R. §§ 1.2110(j), 1.2110(n); *see also id.* § 1.2111.

The unjust enrichment period exists to "ensure that meaningful small business participation [in the wireless services industry] is not thwarted by transfers of licenses to non-designated entities." Competitive Bidding Proceeding, 63 Fed. Reg. 2,315, 2,320-21 (Jan. 15, 1998). To that end, designated entities must report any event that would affect their

---

[1]     Unless otherwise noted, all Code of Federal Regulation citations refer to the regulations in force during the relevant period.

eligibility to retain their bid credits during that period. 47 C.F.R. § 1.2114(a). If, for example, a designated entity transfers control of a license to an entity that does not qualify as a designated entity during the unjust enrichment period, or otherwise fails to maintain its obligations as a designated entity, it must repay some or all the bid credits it received. *See id.* §§ 1.2110, 1.2111.

Once the unjust enrichment period is over, a designated entity may assign or transfer control of a license without any loss of benefits or payment of penalties—but even then, only with the FCC's approval.

### 1. *Designated entity eligibility*

In Auction 97, the FCC provided designated-entity applicants that qualified as a "very small business" with 25% in bid credits toward the cost of any licenses they won at auction. Thus, for example, if a "very small business" won with bids totaling $400 million, it would only have to pay $300 million of that amount, and the Government would absorb the rest. To qualify as a "very small business," applicants had to show their aggregated gross "attributed revenues" for the previous three years did not exceed $15 million. 47 C.F.R. §§ 1.2112, 27.1102(b)(2).

"Aggregated attributable revenues" included an applicant's own revenues plus the revenues of "its affiliates, its controlling interest holders, and the affiliates of its controlling interest holders." 47 C.F.R. § 1.2110(b)(1)(i). Entities with a "controlling" interest were those with *de jure* or *de facto* control. In addition, the revenues of investors with a 10% or greater interest, regardless of whether they controlled the designated entity, would be attributed to the designated entity if the investor used or had an "agreement to use[] more than 25% of the spectrum capacity of a license awarded with bidding credits" during the unjust enrichment period. *Id.* §§ 1.2110(c)(2)(i), (ii)(J). So a designated entity that agreed to let an investor like USCC use more than 25% of its licensed spectrum in one or more markets during the unjust enrichment period would be disqualified from retaining the bid credits it was awarded to purchase the licenses in those markets.

A controlling interest also existed when a management agreement authorized an individual or entity to make decisions or engage in practices or activities that determined or significantly influenced the nature or types of services offered by the licensee, the terms on which

16

services were offered, or the prices charged for such services. 47 C.F.R.
§ 1.2110(c)(2)(ii)(H).

## 2. *Pre- and post-auction qualification and licensing procedures*

To establish their eligibility for bidding credits, applicants must furnish detailed information about their finances and business relationships. Before auction, all would-be bidders must submit a "streamlined, short-form application," which the FCC uses to make a preliminary determination whether bidders qualify as designated entities and are eligible to bid with bidding credits. 47 C.F.R. § 1.2105.

After auction, winning bidders must "file a more comprehensive long-form application" for "the license(s) they won." 47 C.F.R. § 1.2112(b)(2). The FCC uses the information in the "licensing application" to confirm the designated entity's eligibility for bidding credits. *Auction of Advanced Wireless Servs. (Aws-3) Licenses 70 Bidders Qualified to Participate in Auction 97*, 29 FCC Rcd. 13465, 13476 n.3 (Oct. 30, 2014).

The bidding application requires an applicant to disclose and certify: (1) its affiliates and controlling interest holders; (2) the annual gross revenues of its affiliates and controlling interest holders; and (3) its

17

qualifications as a designated entity under the FCC's rules. 47 C.F.R. §§ 1.2105(a)(2)(ii)(B), (a)(2)(iv); 1.2110(c)(i); 1.2112(b)(1)(iv). The application also requires an applicant to identify any "agreements, arrangements, or understandings relating to the licenses being auctioned," including any agreements for the future use of any of the license spectrum. *Id.* §§ 1.2105(a)(2)(viii), 1.2112(b)(1)(iii).

The licensing application requires similar disclosures and certifications. 47 C.F.R. §§ 1.2107(c), 1.2110(b)(1)(i), (j). In addition, the licensing application requires a designated-entity bid winner to: (1) list and summarize the agreements that affected its designated-entity status, including a detailed explanation of the terms and conditions and parties involved in any bidding agreements it had entered before the bidding was completed; and (2) attach a copy of each agreement to the application. *Id.* §§ 1.2107(d), 1.2110(j).

### 3. *Post-licensing "Annual Report" and "buildout" requirements during the unjust enrichment period*

To retain their bid credits throughout the unjust enrichment period, designated-entity licensees must file Annual Reports with the FCC, in which they must expressly certify that they continue to qualify as designated entities, and list and summarize all the agreements that

18

relate to their designated-entity eligibility, including any new agreements they may have entered after being granted the licenses. 47 C.F.R. §§ 1.2110(b)(3)(ii), (n); 1.2111(b)(1).

The FCC requires all licensees, including designated entities, to meet certain "buildout" requirements, to construct the necessary infrastructure and meet specified coverage requirements within a given period. 47 C.F.R. § 27.14(s)(1). Failing to do so results in early termination of the licenses. *Id.* § 27.14(s)(3). To show they are meeting their buildout requirements, licensees must file "Construction Notices" with the FCC expressly certifying they are meeting their buildout obligations. *Id.* § 27.14(k).

## II.    ALLEGATIONS IN THE AMENDED COMPLAINT

Defendant USCC is one of the largest wireless companies in the United States with billions in revenues. Beginning in 2014 and continuing through at least July 2021, USCC, Allison DiNardo, and Advantage—a company formed in partnership with USCC, DiNardo, and William Vail, a retired former telecommunications employee—engaged in a scheme to defraud the Government of nearly $113 million. [Doc.174¶2]. Defendants formed Advantage to participate in Auction 97

as a designated-entity front for USCC to purchase spectrum licenses for USCC using bid credits for which USCC was not itself eligible; to hold the licenses for USCC until the unjust enrichment period ended; and then to formally transfer the licenses to USCC. *Ibid.*

Plaintiffs' original complaint was filed before the FCC awarded the licenses to Advantage and alleged a pre-licensing fraudulent scheme to *obtain* licenses for USCC at a discount. Plaintiffs amended their complaint in 2022, bringing additional FCA fraud claims, including a post-licensing scheme to *retain* the licenses and bid credits afterward. At no time did Advantage ever provide wireless services to the public. [Doc.174¶5]. Instead, USCC financed and met the requirements attached to Advantage's licenses. [Doc.174¶¶6-7, 70].

To satisfy the FCC that it was an eligible "very small business," Advantage needed to establish that it had no disqualifying relationships—that it had no controlling interests or affiliates whose aggregated attributable revenues exceeded $15 million. USCC's billions of dollars in revenue greatly exceeded that threshold. So Advantage repeatedly and falsely certified that: (1) Vail held the only controlling interest in Advantage; (2) Advantage did not have a management

20

agreement with any entity; (3) Advantage had no affiliates other than Vail-related entities; and (4) neither DiNardo's nor USCC's revenues were attributable to Advantage. [Doc.174¶¶79-80]. Advantage's applications and reports to the FCC reinforced these false and fraudulent certifications.

In fact, as plaintiffs' independent knowledge showed, Advantage never functioned except as the nominal custodian of the licenses, and defendants fraudulently failed to disclose to the FCC the agreements, arrangements, and understandings that governed their actual, disqualifying relationships. [Doc.174¶¶72, 87-92, 110, 119-21, 131].

## A.   Prior to Auction 97, Defendants Engaged in Other Sham Designated-Entity Schemes.

As detailed in the related appeal, USCC and DiNardo formed and used several sham designated entities to acquire spectrum licenses for USCC at a discount in a series of auctions between 2002 and 2016. *See* [Doc.174¶¶19, 68]. These entities secretly ceded control of their spectrum to USCC during their unjust enrichment periods and formally transferred their licenses to USCC thereafter. [Doc.174¶68].

In 2007, USCC and DiNardo formed and used King Street Wireless, L.P., to acquire spectrum licenses with $100.2 million in bid credits in

Auction 73. The FCC granted King Street the licenses on December 27, 2009, and the unjust enrichment period ended on December 27, 2014. [Doc.174¶69].

Shortly after receiving the discounted licenses, King Street/DiNardo secretly transferred control of the spectrum to USCC (2011 King Street Lease). [Doc.174¶70] Plaintiffs discovered, through a spectrum analysis of markets where King Street held its discounted licenses, that USCC controlled and was using a disqualifying amount of King Street's spectrum during the unjust enrichment period, which—had it been reported as required—would have resulted in King Street having to pay back some or all of the bid credits it used to buy the licenses. Plaintiffs disclosed their discovery to the Government, which ultimately resulted in King Street providing the secret 2011 King Street Lease to the Government for the first time. Before that, USCC had submitted a summary of a fictitious 2012 agreement to the FCC that purported to give USCC control over only a *non-disqualifying* amount of King Street's spectrum. Opening Br. 24-26, No. 23-7044 (related appeal brief detailing these events).

Because King Street had a controlling interest in Advantage through DiNardo, however, the FCC's rules required Advantage to attribute King Street's revenue to itself. In turn, because USCC's revenue was attributable to King Street, USCC's revenue was also attributable to Advantage. Since defendants never disclosed any of this to the FCC, King Street and Advantage retained their designated-entity statuses throughout their unjust enrichment periods. *See* [Doc.174¶¶68-73].

## B. Advantage Fraudulently Participated as a Designated Entity in Auction 97.

In May 2014, while King Street was still in the unjust enrichment period, the FCC announced Auction 97. [Doc.174¶74]. To deflect possible scrutiny of DiNardo/King Street, USCC and DiNardo engaged William Vail, a retiree with no previous experience with FCC spectrum auctions, to form Advantage to participate as a designated entity in Auction 97. [Doc.174¶¶75-76, 81]. The general partner and 10% owner of Advantage was Frequency Advantage, L.P. [Doc.174¶¶14-18,20, 105]. Through a subsidiary, USCC was the "Limited Partner" and 90% owner of Advantage.

In November 2014, Advantage applied to participate in Auction 97 as a "very small business" with 25% bidding credits. [Doc.174¶77].

23

Advantage expressly certified that: (1) Vail held the only controlling interest in Advantage; (2) Advantage had no affiliates other than Vail-controlled entities; and (3) neither USCC's nor DiNardo's revenues were attributable to Advantage. [Doc.174¶¶79-80].

Relying on Advantage's bidding application, the FCC permitted Advantage to bid in Auction 97 as a designated entity. [Doc.174¶¶85-86]. After 341 rounds of bidding over 45 days, Advantage was the nominal winner of 124 licenses, virtually all of which were adjacent to and/or overlapped with USCC's wireless service areas. [Doc.174¶¶85, 94]. And in February 2015, Advantage submitted its licensing application, claiming eligibility for $112.7 million in bid credits to purchase the licenses. [Doc.174¶¶95-96]. As it had in its bidding application, Advantage certified that its only controlling interests or affiliates were Vail and his entities, and that it had not entered any agreements that would affect its eligibility. [Doc.174¶¶97-100].

Advantage was not the only bogus designated entity in Auction 97. In May 2015, after the winning bidders had submitted their licensing applications, eight parties petitioned the FCC to deny bidding credits to two other designated entities in Auction 97—SNR Wireless, LLC, and

Northstar Wireless, LLC—claiming that they were controlled by DISH Network Corporation, a major services provider with annual gross revenues in the billions. The FCC ultimately found that DISH's revenues were attributable to SNR and Northstar, disqualifying them from using bid credits for the licenses they won at auction. *In re Northstar Wireless, LLC,* 30 FCC Rcd. 8887, 8907 (Aug. 18, 2015). The FCC also found them ineligible based on their management services agreements with DISH. *Id.* at 8908; *see* 47 C.F.R. § 1.2110(c)(2)(ii)(H).[2]

Soon after, DiNardo transferred her ownership interest in Advantage to Vail, who then filed two unusual certifications with the FCC. [Doc.174¶¶20, 105]. In January and March 2016, Vail expressly certified that Advantage had listed and summarized all agreements and understandings "relevant to its eligibility" as a designated entity—and denied any disqualifying relationships or "future agreements or

---

[2] This Court affirmed and remanded for SNR and Northstar "to renegotiate their agreements with DISH" and "cure" the deficiencies that made them ineligible as designated entities. *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1046 (D.C. Cir. 2017). The FCC found that neither sufficiently addressed its concerns on remand. *See In re Northstar Wireless, LLC*, 35 FCC Rcd. 13317, 13318 (Nov. 23, 2020). This Court affirmed. *Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 196-97 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2693 (2023).

25

arrangements … including management services agreements" with any person or entity. [Doc.174¶¶109, 106].

On July 5, 2016, the FCC granted Advantage's application to use $112.7 million in bid credits to buy 124 spectrum licenses. [Doc.174¶111]. Advantage's unjust enrichment period ended on July 5, 2021. *Ibid.*; *see* 47 C.F.R. §§ 1.2110; 12114(a).

### C. Defendants' Post-Licensing Disclosures to the FCC Were False and Fraudulent.

On top of falsely certifying itself as an eligible designated entity, Advantage's post-licensing 2016 and 2017 Annual Reports certified that it had no disqualifying relationships affecting its continued eligibility. [Doc.174¶¶112,113].

Advantage's 2018 and 2019 Annual Reports repeated these certifications, stating that Advantage's previously identified agreements and arrangements remained "current," and that Advantage was making "progress in meeting construction requirements," "in the planning stages of construction," and "considering equipment capabilities." [Doc.174¶¶114,116].

After Advantage entered the final year of its unjust enrichment period, it disclosed that it had entered three spectrum manager leases

with USCC for some or all of Advantage's spectrum in 120 markets. [Doc.174¶¶124,125]. For 76 of these licenses, however, Advantage asserted that the leases covered less than 25% of the available spectrum capacity and that no unjust enrichment payments were required. [Doc.174¶126]. Advantage also expressly recertified that it retained *de facto* control of the licenses and was eligible to retain its bid credits. [Doc.174¶¶127,128].

In dozens of submissions to the Government, Advantage presented itself as a wireless telecommunications company that could build networks and provide services using 124 spectrum licenses. But plaintiffs independently established that Advantage was a shell company that only ever existed on paper.

Plaintiffs found that: (1) Advantage's initial offices consisted of an interior room in a vacant office suite, and that the landlord rarely or never saw him there; (2) Vail had no previous experience with FCC spectrum auctions; (3) USCC had to hire experts to educate Vail on the mechanics of placing bids; (4) the other "Authorized Bidder" identified in Advantage's bidding application was employed and controlled by DiNardo; (5) the bidding was conducted from King Street's offices; (6)

27

both DiNardo and at least one senior USCC employee participated in the bidding; and (7) Advantage's bidding was limited to spectrum licenses that would benefit USCC. [Doc.174¶¶86-94].

Plaintiffs also found that, after receiving the licenses, Vail/Advantage took no steps to function or operate as the wireless services company it claimed to be. Plaintiffs discovered that Advantage's only other addresses were a storefront in a strip mall (where, again, the landlord said he rarely or never saw Vail), and Vail's home in a Florida retirement community. [Doc.174¶¶87-88, 120-22]. Plaintiffs further found that Advantage/Vail never hired any employees, never established a website, never acquired a phone number, and never advertised itself as a wireless company.

In short, while Advantage was required to provide reliable signal coverage and offer service to at least 40% of the population in each of its 124 license areas by July 5, 2022, *see supra* p.19, plaintiffs determined that Advantage could not function as a company with *any* spectrum licenses, much less 124 licenses worth over $450 million. Instead, Advantage relied on USCC to meet its buildout requirements and provide services—even as Advantage disclaimed that it had entered any

management agreement with any other individual or entity. [Doc.174¶¶118-21].

## III.  PROCEDURAL HISTORY

Plaintiffs filed the original complaint in the Western District of Oklahoma in 2015. The Government declined to intervene, [Doc.44], and in July 2020, the case was transferred to the District of Columbia, [Doc.128].

1. Defendants moved to dismiss the original complaint on various grounds. On March 31, 2022, the district court dismissed the complaint without prejudice, exclusively on public disclosure grounds. [Doc.170].

The court found that five agreements, which were submitted as attachments to Advantage's licensing application, and USCC's 2014 annual shareholder report, *see* USCC, Annual Report (Form 10-K) (Feb. 25, 2015), https://perma.cc/JR5Q-2ZZ4, which was filed with the Securities and Exchange Commission (SEC), publicly disclosed the fraud alleged in the complaint.[3] [Doc.170_at_9]. Those five agreements were

---

[3]    The district court misstated that USCC's Form 10-K was "submitted for the FCC's review as part of the Auction 97 process." [Doc.170_at_10]. There is no evidence the shareholder report was ever submitted to the FCC.

the: (1) Frequency Partnership Agreement; (2) Advantage Partnership Agreement; (3) Bidding Protocol Agreement; (4) 2014 Frequency Loan and Security Agreements; and (5) 2014 Advantage Loan and Security Agreements.

The district court believed that to avoid the public disclosure bar, *plaintiffs* had the burden to "provide enough" *nonpublic information* "to make the entire body of evidence in a claim not 'substantially the same' as what has already been publicly disclosed." [Doc.170_at_10]. Rather than address plaintiffs' fraud allegations, the district court analyzed only whether plaintiffs' "surveillance and private investigation" evidence was substantially similar to what was contained in Advantage's FCC filings. *Ibid.* That nonpublic information, according to the court, showed only "that: (1) a [USCC] executive was present at the Auction 97 bidding; (2) Advantage conducted its bidding from King Street's offices; (3) one of Advantage's designated bidders—Stephen Hinz—was a King Street employee; (4) Advantage's Florida offices were unused;" and "(5) Advantage and King Street shared a lawyer." [Doc.170_at_10-11].

The court did not determine whether the filings contained "substantially the same … transactions" establishing all essential

elements of plaintiffs' FCA claims, i.e., falsity, materiality, and scienter. Instead, the district court held that plaintiffs' nonpublic evidence was not "substantially dissimilar from what had already been publicly disclosed" in the FCC filings. [Doc.170_at_11].

Turning to the original source inquiry, the district court stated: "Here again the question comes down to whether Plaintiff-Relators' surveillance and private investigations materially add to the allegations and transactions already in the public domain." [Doc.170_at_11].

The court did not address whether plaintiffs' independent knowledge included *both* their nonpublic evidence *and* the inferences of fraud they gleaned from otherwise "innocuous information" in the public domain. *See Springfield Terminal*, 14 F.3d at 657. The court only examined whether the nonpublic evidence alone added materially to what Advantage disclosed to the FCC. "The only information that their surveillance and private investigation efforts provide beyond what was already available in the public domain," according to the court, was "that Advantage's offices were vacant and that Hinz was a King Street employee during Auction 97." [Doc.170_at_10, 12]. "This," the court held, did "not significantly expand the court's understanding of the essential

31

factual background of this case." *Ibid.* "Nor," according to the court, was "it information that might have otherwise influenced the Government, as shown by the fact that the Government elected not to intervene in this case." [Doc.170_at_12].

2. On April 29, 2022, plaintiffs filed the amended complaint, which: (1) restated allegations relating to defendants' pre-licensing frauds; (2) added new allegations relating to defendants' post-licensing frauds; (3) added allegations relating to Advantage's failure to disclose its disqualifying relationship with King Street; and (4) expanded upon plaintiffs' original source allegations with independent knowledge that, post-licensing, Advantage took no steps to act as a wireless services company with $451 million worth of spectrum licenses. [Doc.174].

Defendants again moved to dismiss. And on March 9, 2023, the district court dismissed the amended complaint, this time with prejudice, based solely on the public disclosure bar. [Doc.189_at_2]. The court drew largely from its first opinion to find that: (1) the same six documents identified in its prior opinion were public disclosures barring the Amended Complaint; (2) plaintiffs' allegations of defendants' *de facto* control of Advantage relied on these filings; and (3) plaintiffs' *nonpublic*

32

*"evidence"* did not "materially add to the allegations and transactions already in the public domain." [Doc.189_at_2-3] (emphasis added).

Along with reaffirming its initial opinion, [Doc.189_at_5], the court found that the added allegations of Advantage's disqualifying relationship with King Street were "not substantially dissimilar from the allegations arising from the FCC filings themselves" and were therefore also barred, [Doc.189_at_8]. The court added that "other public documents—including statements from the FCC itself—ha[d] already revealed that USCC and King Street agreed to share network around that time," and so "any inference of control" was "already public." *Ibid.* The court did not address that none of those public documents showed a *disqualifying* relationship or transaction.

Finally, the court held that plaintiffs are not original sources, again limiting the inquiry to their nonpublic evidence. According to the court, evidence that Advantage did not actually exist except on paper and did not function post-licensing as a wireless services company did not materially add to the information available to the public. [Doc.189_at_8].

## STANDARD OF REVIEW

This case is at the pleading stage, and the public disclosure bar is an affirmative defense on the merits. *See United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 738 n.1 (10th Cir. 2019) (collecting cases and noting that circuits "have unanimously held that the 2010 'amendments transformed the public disclosure bar from a jurisdictional bar to an affirmative defense'" (quoting *United States ex rel. Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir. 2017))). Accordingly, this Court should review the district court's decision *de novo* and affirm only if "the defendant" meets its "burden of pleading and proving" some obvious bar to securing relief on the face of the complaint. *E.g.*, *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) ("defendant bears the burden of pleading and proving" affirmative defenses). "If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014).

34

## SUMMARY OF ARGUMENT

**I.** This is not the sort of case Congress wanted dismissed when it enacted and amended the public disclosure bar. The FCA seeks to protect the Government from fraud. Consistent with that broader purpose, the public disclosure bar precludes "parasitic" actions, e.g., cases in which relators simply copy publicly available allegations and then claim a piece of the Government's recovery. This case is not a parasitic action. Here, relators with invaluable expertise put in serious work to comb through dense, technical primary sources to piece together a fraud the Government would not have discovered on its own. Congress intended to reward such labor, not deter it. The Court should construe and apply the public disclosure bar accordingly.

**II.** The bar was not triggered because no qualifying public disclosure of the allegations alleged in the complaint occurred. Advantage's FCC filings and USCC's Form 10-K do not reveal the frauds alleged by plaintiffs, i.e., falsity, materiality, and scienter to make out an FCA claim. So the question is whether the relevant "transactions," i.e., facts from which one could reasonably infer the alleged fraud, were disclosed in the channels enumerated in the statute. They were not.

35

**A.** The filings were not disclosed in any enumerated channel, so the public disclosure bar does not apply. *Springfield Terminal*, 14 F.3d at 651 (must first show disclosure in an enumerated channel that discloses the frauds alleged for bar to apply).

The district court believed Advantage's application for benefits filed with the FCC was a public disclosure through the first enumerated channel. [Doc.189_at_6-7]. But the first enumerated channel applies only to disclosures in a "criminal, civil, or administrative hearing in which the Government or its agent is a party." 31 U.S.C. § 3730(e)(4)(A)(i). Because the Government was not a party to the FCC's application procedures, Advantage's filings are excluded from this channel.

Nor do Advantage's filings fall under the second enumerated channel, which also references Federal hearings, e.g., congressional hearings. Holding otherwise would render the first channel, and especially the Government-party limitation that Congress inserted in 2010, meaningless. The correct reading of the statute is that the second channel applies only to Federal hearings that are not addressed by the first channel. When, as here, Congress deliberately excluded certain

36

hearings from the first channel, the second channel should not be read broadly to reinclude them.

**B.** Reversal is also warranted because the documents did not disclose "substantially the same … transactions" as the frauds alleged in the complaint. 31 U.S.C. § 3730(e)(4)(A). Those disparate documents did not "reveal the essential elements of a fraudulent transaction." *Springfield Terminal*, 14 F.3d at 657.

Rather than examining whether the transactions disclosed in Advantage's FCC filings contained all the "essential elements" of plaintiffs' fraud allegations, i.e., falsity, materiality, and scienter, the court instead looked only to whether the nonpublic evidence from plaintiffs' surveillance and investigations was "substantially similar" to Advantage's filings.

Plaintiffs alleged that Advantage falsely claimed to be a legitimate wireless services company not subject to USCC's or King Street's control. Plaintiffs also alleged that Advantage failed to disclose agreements to hold the licenses for USCC's benefit until the end of the unjust enrichment period. If, as the court suggested, Advantage's FCC filings and USCC's annual shareholder report disclosed those transactions or

37

agreements, then the FCC would have rejected Advantage's licensing application, just as it rejected SNR's and Northstar's licensing applications. *Supra* pp.24-25 & n.2.

In holding to the contrary, the district court failed to accept plaintiffs' well-pleaded allegations. As to the *disqualifying* secret 2011 King Street Lease, the court found that it was not "substantially dissimilar" from the fictitious, public 2012 agreement (which was *not disqualifying*). [Doc.189_at_8]. After rejecting the relevance of the secret agreement, the district court then rejected as *implausible* plaintiffs' allegations that Advantage failed to disclose "other oral or implied agreements … necessary to carry out the conspiracy." *Ibid.* That is particularly concerning considering this Court's recent decision in a *qui tam* action against DISH, SNR, and Northstar, where the Court held that relator's same allegation that the DISH-controlled entities "faile[d] to disclose agreements central to their eligibility for bidding credits" was sufficient to plead materiality. *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless*, LLC, 34 F.4th 29, 36-37 (D.C. Cir. 2022).

**II.**  Plaintiffs are an original source of the fraud allegations because their "independent knowledge" materially added to the publicly disclosed transactions.

The public disclosure bar proscribes parasitic lawsuits where relators merely bring claims based on misconduct already in plain view. Here, by contrast, plaintiffs managed to identify fraud by applying their specialized expertise in telecommunications law (specifically FCC wireless spectrum auction and licensing regulations) to review defendants' submissions to the FCC and other facially innocuous documents, and by conducting months of investigations and surveillance on defendants. That fraud would have gone unnoticed without plaintiffs' efforts, and the FCA seeks to encourage such labor—not stifle it.

The district court did not meaningfully contend with the "materially adds" requirement but limited its inquiry to the nonpublic evidence plaintiffs uncovered in their investigations. Even on that limited view, it is plaintiffs' investigation and surveillance that exposed Advantage as the nonexistent sham that it always was.

In any event, the district court failed to recognize that plaintiffs' specialized expertise "materially adds" to the public disclosures because

39

it was essential to understanding how defendants' facially innocuous and disconnected statements masked the fraud. The court's conclusion conflicts with the statute's plain meaning, its amendment history and intent, and even precedents from this Court that predate the 2010 amendments statute—all of which establish that knowledge like plaintiffs' is critical to redress complex frauds.

## ARGUMENT

### I.    THE PUBLIC DISCLOSURE BAR WAS NOT DESIGNED TO COMPEL DISMISSAL OF CASES LIKE THIS ONE.

Dismissal of this case is at odds with the purpose of the public disclosure bar, and, more broadly, the FCA. The FCA enlists the entire citizenry to partner with the Government to stop fraud, by allowing any "person" to sue. 31 U.S.C. § 3730(b)(1); S. Rep. No. 99-345, at 2, 8. The public disclosure bar precludes actions that are "parasitic" in the sense that the relator adds nothing the publicly disclosed information, yet still seeks to claim a piece of the recovery. The paradigmatic parasitic case is one where a relator who merely copies an indictment seeks a windfall. *See* S. Rep. No. 110-507, at 22; 145 Cong. Rec. E1546-01, 1999 WL 495861, at *E1546.

This case is nothing like that. Advantage's applications gave the FCC no reason to think that Advantage was a sham fronting for USCC. They were, in fact, drafted to conceal defendants' scheme. To identify the fraud, plaintiffs had to dig through hundreds of pages of filings and agreements, conduct private investigations and surveillance, and apply their legal and industry knowledge to those disparate data points to reveal how defendants deceived the FCC and obtained over $112 million in Government subsidies to which they were not entitled.

Plaintiffs did exactly what the public disclosure bar's architects hoped they would do: They used their "education, training, experience, [and] talent to uncover a fraudulent scheme" that was previously hidden. 145 Cong. Rec. E1546-01, at *E1547. They are well-qualified not only to bring the case in the first instance, but also to carry it forward, because they can anticipate, understand, and help refute the arguments defendants will inevitably make to justify their conduct. Actions by outsiders like plaintiffs advance Congress's purpose.

Any suggestion that the Government has notice of any fraud that can be inferred from public information is also misguided. As a practical matter, the Government, which has many demands on its limited

resources, cannot dissect every FCC filing for evidence of fraud. *See*, *e.g.*, S. Rep. No. 99-345, at 7 ("[T]he most serious problem plaguing effective enforcement is a lack of resources on the part of Federal enforcement agencies.").

Enforcement priorities and prosecutors' expertise will also influence the Government's ability to catch fraud. If fraud is happening where the Government is not looking, the fraud will not be discovered unless a relator speaks up—and it may not be pursued unless the relator does it. This is precisely why Congress wanted relators not only to file, but also to litigate, cases on the Government's behalf. *See, e.g.*, S. Rep. No. 99-345, at 24; 145 Cong. Rec. E1546-01, at *E1546.

Even if the Government were aware of every fraud that could be inferred from publicly available information, it would be wrong to bar all cases based on such information. The public disclosure bar replaced the Government knowledge bar, which Congress thought was blocking too many cases. Thus, Congress wanted relators to bring and pursue at least some cases in which the Government knows about a fraud but is not, for whatever reason, in a position to redress it.

42

Consistent with that view, the public disclosure bar's own architects have reacted with "dismay" to judicial decisions construing the bar broadly and the original source exception narrowly. 145 Cong. Rec. E1546-01, at *E1546; S. Rep. No. 110-507, at 24. In 2010, these legislators advanced amendments narrowing the bar even further to drive home that courts had been getting it wrong. Under the current statutory language, it is clearer than ever that the bar applies only to disclosures in the enumerated channels (which are narrower than they were before), and that the original source exception is not limited to insiders with direct, firsthand knowledge of fraud, but includes anyone whose knowledge materially adds to the publicly disclosed information.

## II.    NO QUALIFYING PUBLIC DISCLOSURE OCCURRED.

The public disclosure bar does not apply to information just because it is in the public domain. Instead, it applies only if "substantially the same allegations or transactions as alleged," i.e., the FCA fraud, were publicly disclosed in one of the channels specified in the statute. 31 U.S.C. § 3730(e)(4)(A).

The question encompasses two distinct but related determinations. First, whether "the public disclosure occurs through certain channels

43

specified in the statute." *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 474 (D.C. Cir. 2016). Thus, a disclosure *to* the Government—as in spectrum applications—is not a public disclosure unless it is made in one of the enumerated channels. *See*, *e.g.*, *United States ex rel. v. Foreman v. AECOM*, 19 F.4th 85, 123 (2d Cir. 2021); *United States v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 782 F.3d 260, 268 (6th Cir. 2015); *see also United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 684 (D.C. Cir. 1997). Second, whether the publicly disclosed allegations or transactions are "substantially the same" as the relator's allegations of fraud. 31 U.S.C. § 3730(e)(4)(A).

None of the cited disclosures meets either prong of the test.

### A.    None of the Documents Cited by the District Court was Disclosed in an Enumerated Channel.

The district court held that Advantage's filing in Auction 97 qualified as a public disclosure in the first enumerated channel, based on this Court's decision in *Springfield Terminal*, 14 F.3d at 652, which

interpreted the 1986 version of the statute. [Doc.189_at_6-7]. That is plainly wrong. [4]

1. In 2010, Congress amended the statute to provide that the bar is triggered only when a qualifying disclosure occurs:

> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media.

31 U.S.C. § 3730(e)(4)(A). Defendants did not argue, and the district court did not hold, that any of the documents are "from the news media." 31 U.S.C. § 3730(e)(4)(A)(iii). So the question is whether they are disclosures within romanette (i) or (ii).

Before the 2010 amendments, the channel in romanette (i) had been interpreted to apply to disclosures in any criminal, civil, or administrative hearing—whether Federal or not, and whether the Government was a party or not. Courts, including this Court, also held that the word "hearing" was synonymous with "proceeding," and

---

[4]     USCC's 2014 annual shareholder report was only ever filed with the SEC. *Supra* n.3. For the same reasons herein, that filing also was not disclosed in an enumerated channel.

encompassed documents made public during a criminal, civil, or administrative proceeding even if no actual "hearing" occurred. *Springfield Terminal*, 14 F.3d at 652.

The district court relied on *Springfield Terminal* to hold that under the post-2010 version of the statute, too, "FCC filings for licensing proceedings … qualify as public disclosures" under romanette (i). [Doc.189_at_6-7]. The district court did not find that "the Government or its agent is a party" to such proceedings, as the amended statute requires. *See* 31 U.S.C. § 3730(e)(4)(A)(i). Indeed, the court conspicuously omitted the "Government or its agent is a party" limitation from its decision entirely. [Doc.189_at_6] (quoting romanette (i)). By accepting defendants' rewriting of the law, the court nullified Congress's multi-year efforts to amend the public disclosure bar.

Previously, a single clause barred suits based on disclosures in "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4)(A) (1986). The 2010 amendments narrowed the hearings that would trigger the bar under romanette (i) to Federal hearings in which the Government is a party.

Advantage's application for bid credits is not a channel (i) disclosure for two reasons. *First*, as the Ninth Circuit explained in *Silbersher*, the text of romanette (i) "contemplates an adjudicatory hearing before a neutral tribunal or decisionmaker." 76 F.4th at 853 (citing the definition of *Hearing* and *Administrative Hearing* in Black's Law Dictionary (11th ed. 2019)). And "the term 'party' describing the government's role in such a hearing contemplates that channel (i) hearings are also adversarial," given that "criminal hearings are always adversarial, and civil and administrative hearings are very often adversarial when the government is a party." *Ibid.* (quotation marks omitted).

The FCC's designated-entity application process is not an *adversarial* proceeding "adjudicated on the merits before a neutral tribunal or decisionmaker." *See, e.g.*, *Silbersher*, 76 F.4th at 853; *United States ex rel. Schnupp v. Blair Pharmacy, Inc.*, 2022 WL 17584381, at *16 (D. Md. Dec. 9, 2022) (same). In fact, FCC regulations provided that the agency may—as it did here—grant a designated-entity application "*without a hearing*." 47 C.F.R. § 1.945(c) (emphasis added). Although the FCC *can* "designate" an application for a "hearing," *id.* §§ 1.945(d)-(e), no one disputes that this is not what occurred here.

47

*Second*, the Government is not "a party" in the FCC's licensing proceedings. In this context, the word "party" refers to litigants—not adjudicators. *Silbersher*, 76 F.4th at 854 (a "'party'" is "'[o]ne by or against whom a lawsuit is brought'") (quoting *Party*, Black's Law Dictionary (11th ed. 2019)). That is why the presence of a federal judge does not turn every civil case into a hearing in which the Government is a party. In Auction 97, the Government was the adjudicator of Advantage's claim for designated-entity status, not a party to the action.

Thus, the district court's minimal analysis regarding the interpretation of "hearing" in *Springfield Terminal*—while perhaps correct under the pre-amended version of the statute—is inapplicable here, where a much different statutory standard applies. The disclosures in *Springfield Terminal*—filings in litigation in which the Government was not a party—no longer qualify as public disclosures under the statute.

2. Although the district court did not rely on the second enumerated channel to hold that "FCC filings for licensing proceedings … qualify as public disclosures," [Doc.189_at_6-7], defendants argued that the FCC's application process qualifies as an administrative hearing

48

conducted before a Federal body, making it a Federal hearing within 31 U.S.C. § 3730(e)(4)(A)(ii).

*First*, that cannot be correct, because if it is, then the phrase "in which the Government or its agent is a party" in romanette (i) does no work. After all, every Federal criminal, civil, and administrative proceeding would fall under the statute because the adjudicator is part of the Federal Government. This would nullify Congress's 2010 amendment to the statute and render romanette (i) (which covers only a subset of Federal hearings) superfluous.

The Supreme Court has instructed that "to determine the meaning of one word in the public disclosure bar, we must consider the provision's entire text, read as an integrated whole." *Kirk*, 563 U.S. at 408 (quotation marks omitted). That exemplifies the general rule that courts "hesitate[] to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (quotation marks omitted). The argument is especially strong here because, "[w]hen Congress acts to amend a statute, we presume it intends its amendment

49

to have real and substantial effect." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258-59 (2004) (quotation marks omitted).

The correct reading is that if the asserted public disclosure occurs during a "Federal criminal, civil, or administrative hearing," then the bar applies only if "the Government or its agent is a party," as provided in romanette (i). Romanette (ii), therefore, covers "Federal ... hearing[s]" only to the extent they are not criminal, civil, or administrative in nature (e.g., congressional hearings, which is the example Congress provided in (ii) itself). This interpretation gives meaning to every word in the statute and is the only one consistent with the 2010 amendments, which added the Government-party limitation to romanette (i), and removed the word "administrative" from romanette (ii). This reading also implements the maxim "that the specific governs the general," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quotation marks omitted), by allowing the specific provision Congress enacted for Federal criminal, civil, and administrative hearings to take precedence over the more general provision for other Federal hearings.

*Second*, "channel (ii) is primarily concerned with proceedings to gain information," *Silbersher*, 76 F.4th at 853, and Advantage's

submissions to the FCC were not made in a channel (ii) federal report, hearing, or investigation. "A 'report, hearing, audit, or investigation' all suggest the 'activity of trying to find out the truth about something,' whether by 'an authoritative inquiry into certain facts, as by a legislative committee, or a systematic examination of some intellectual problem or empirical question.'" *Ibid.* (quoting *Investigation*, Black's Law Dictionary (11th ed. 2019)). All "four nouns apply to a fact-finding or investigatory process to obtain information, and together indicate that Congress intended for channel (ii) to cover a wide array of investigatory processes." *Ibid.*

Here, the alleged public disclosures were made *by Advantage* in applications for benefits from the Federal Government, and not in a Federal report—which should, at a minimum, be a document authored by the Federal Government. *See Silbersher*, 76 F.4th at 849. A report is "something that gives information or a notification, or an official or formal statement of facts or proceedings." *Kirk*, 563 U.S. at 407. In contrast, the FCC's website provides access to databases that contain filings by private entities in support of their claims for benefits. Neither the website nor the accessible databases are Federal "reports" that "give[]

51

information or a notification, or an official or formal statement of facts or proceedings." *Compare ibid.* (information released in response to a FOIA request—which necessarily entails the efforts of Federal agents—was a public disclosure). That Advantage's applications were found in databases that are accessible through the FCC's website does not make them Federal "reports."

Treating applications for a government benefit as an enumerated disclosure would largely render the FCA a nullity. Often, as here, the applications themselves *are the very claims* that relators assert as false and fraudulent. If such applications are considered public disclosures of the fraudulent transactions, most, if not all, relators would be barred from alleging that the claims were made in violation of the FCA. *But see Northstar Wireless, LLC*, 34 F.4th at 31 (reversing district court decision dismissing the relator's *qui tam* action alleging "that several telecommunications companies defrauded the United States Government of $3.3 billion by manipulating [FCC] rules and falsely certifying their eligibility for discounts on spectrum licenses").

**B.     The Publicly Available Documents Did Not Disclose "Substantially the Same" Frauds Alleged.**

Even if the six documents identified by the district court fell within a statutory channel, they did not disclose "substantially the same allegations or transactions as alleged in the action or claim." 31 U.S.C. § 3730(e)(4)(A). Plaintiffs alleged that defendants fraudulently acquired and retained benefits to which they were not entitled, in violation of the FCA. These allegations required plaintiffs to plead that Advantage's pre- and post-licensing filings were false and fraudulent, that defendants acted with scienter, and that their false claims were material to the FCC's decision to grant Advantage over $112 million in bid credits. These documents disclose none of those essential elements—and indeed, they could not have because the FCC granted the benefits to Advantage, unlike the DISH companies, which were disqualified as designated entities based on their applications. *See Supra* pp.24-25 & n.2.

Plaintiffs' FCA *allegations* were not publicly disclosed. *See* 31 U.S.C. § 3730(e)(4)(A). The question, then, is whether Advantage's and USCC's public "*transactions*" disclosed all the essential elements of the alleged frauds. *Ibid.* (emphasis added). The district court failed to conduct this inquiry. If it had, it would have concluded that these

disparate, facially innocuous documents did not disclose "substantially *the same*" FCA allegations plaintiffs pleaded. *Ibid.* (emphasis added).

In conducting this inquiry, courts are mindful that "[e]mbracing too broad a definition of 'transaction'" would "threaten[] to choke off the efforts of *qui tam* relators in their capacity as 'private attorneys general,'" in conflict with the "recognized purpose of the" FCA. *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1514 (8th Cir. 1994). Consequently, courts hold that a "transaction" is disclosed only if all "the essential elements comprising that fraudulent transaction" have been "publicly disclosed so as to raise a reasonable inference of fraud." *Ibid.*; *see also United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 918-19 (6th Cir. 2017) (same); *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003) (same).

Thus, under this Court's precedents, the disclosure must be specific to the fraud alleged in the complaint. As the Court has explained, "the courthouse doors do not swing shut merely because innocuous information necessary though not sufficient to plaintiff's suit has already been made public." *Springfield Terminal*, 14 F.3d at 657. Other courts agree that a mere disclosure of "'problems'" or even "generalized fraud"

54

is not enough to bar an FCA complaint; a contrary result "would deprive the Government of information that could lead to recovery of misspent Government funds and prevention of further fraud." *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 577 (9th Cir. 2016). That is why, rather than "conducting the substantial similarity inquiry at too high a level of generality," courts must "take a careful look at the details of each alleged fraud." *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 264 & nn.115-16 (E.D. Pa. 2020) (collecting cases). "By requiring courts to look carefully at the factual similarity between a relator's allegations and a public disclosure, this approach strikes the proper balance between 'encouraging private persons to root out fraud and stifling parasitic lawsuits.'" *Ibid.* (quoting *Kirk*, 563 U.S. at 413); *see also Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013) (same).

The district court did none of this, concluding instead that plaintiffs' *nonpublic evidence* was not "substantially dissimilar from what had already been publicly disclosed" in Advantage's FCC filings and USCC's annual shareholder report. [Doc.170_at_11]. Again, that is not the inquiry. The question is whether the publicly disclosed transactions reveal all the essential elements of an FCA fraud claim.

Advantage's application and its materials *are* the false claims that misled the FCC into granting Advantage benefits for which it wasn't eligible. And neither those materials nor USCC's shareholder report disclose that Advantage later made other false representations to unlawfully *retain* the bid credits throughout the unjust enrichment period. If those documents had disclosed these separate frauds, then the FCC would not (a) have granted the bid credits or (b) allowed Advantage to retain them.

As to the agreements Advantage attached to its licensing application, they showed, at most, that USCC and DiNardo had *limited* partnership interests in Advantage. *Supra* pp.23-24; *infra* p.57. Such limited partnership interests do not disqualify Advantage as a designated entity and thus do not reveal the alleged fraud. Defendants themselves have argued that because those provisions are consistent with investor protections, they do not disclose any fraud. *See*, *e.g.*, [Doc.179-1_at_22, 28].

The disclosed agreements also contained language reinforcing that Vail alone controlled Advantage and its bidding in Auction 97. That is not only consistent with Advantage acting as a legitimate designated

entity, it is the very basis on which defendants claimed designated-entity eligibility for Advantage. Plaintiffs' allegations required pleading precisely the opposite.

It is hard to see how USCC's shareholder report disclosed substantially the same transactions as the frauds alleged in the complaint when it certified to shareholders that Vail, as the "general partner" of Advantage through Frequency, had the "exclusive right to manage, operate, and control" the partnership subject only to USCC's limited partner investor protections. USCC, Annual Report (Form 10-K) 66 (Feb. 25, 2015). Again, that is precisely the opposite of disqualifying control that plaintiffs alleged. These documents hide the fraud—they do not disclose it.

At a minimum, none of these documents could have disclosed the *post-licensing* fraud alleged by plaintiffs. Indeed, defendants' post-licensing fraudulent conduct could have occurred even in the absence of any pre-licensing fraud. Advantage could have been a legitimate "very small business" when it acquired its licenses, but still have engaged in fraud by hiding any post-licensing arrangements to transfer a

57

disqualifying amount of its spectrum to USCC or to give USCC a disqualifying controlling interest.

The district court was required to view the allegations "in the light most favorable to [plaintiffs] and with all reasonable inferences drawn in [their] favor." *See Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 670 (D.C. Cir. 2023). It did the opposite.

Plaintiffs alleged that a secret agreement in 2011 between USCC and King Street disqualified King Street and, in turn, Advantage as a designated entity. The district court rejected the allegations, finding that USCC's summary of a fictitious 2012 agreement submitted to the FCC, which showed only a *non*-disqualifying amount of spectrum sharing between King Street and USCC, was not "substantially dissimilar" from plaintiffs' allegations. *See* [Doc.189_at_8]. The related appeal sets forth why that is wrong. And the court erred by failing to accept plaintiffs' well-pleaded allegations.

So too, the district court should not have rejected as implausible plaintiffs' allegations that Advantage failed to disclose "other oral or implied agreements … necessary to carry out the conspiracy," any one of which disqualified Advantage as a designated entity. It is not implausible

58

that there are "other oral or implied agreements" between USCC and Advantage to carry out the scheme, including the alleged agreement to transfer the spectrum to USCC. This Court has already credited the same allegations asserted by the relator in a *qui tam* action pursuing FCA claims against the DISH-controlled entities from the *same auction*— accepting the relator's allegations that those defendants "faile[d] to disclose agreements central to their eligibility for bidding credits." *Northstar Wireless, LCC*, 34 F.4th at 37-38.

Finally, the district court should not have credited defendants' assertion that the FCC filings provided enough information from which to infer Advantage's disqualifying relationships. *See* [Doc.189_at_6]; *see also* [Doc.170_at_11]. When there is sufficient information to do so, the FCC denies the licensing application. *See, e.g.*, *supra* pp.24-25 & n.2. Obviously, the FCC did not infer a disqualifying relationship here, as it had in DISH, a fact the district court failed to confront.

## III. PLAINTIFFS ARE ORIGINAL SOURCES.

If the Court determines "substantially the same" FCA allegations were publicly disclosed in an enumerated channel, it should still reverse,

because plaintiffs are an "original source" of the fraud allegations. *See* 31 U.S.C. § 3730(e)(4)(B).

The second path to original source status is available to an individual who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and provided "the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). Under this path, plaintiffs' "knowledge" (specialized expertise in telecommunications law and the independent evidence uncovered in their investigations) enabled them to uncover defendants' fraud and bring this action.

The district court did not seriously grapple with the "materially adds" inquiry in either of its decisions granting defendants' motions to dismiss. Even in its limited analysis, the court erred by cabining the inquiry to whether plaintiffs' nonpublic evidence materially added to the transactions in the public domain. With that limited view, the court held that the evidence did "not significantly expand the court's understanding of the essential factual background of this case" and would not "have otherwise influenced the Government, as shown by the fact that the Government elected not to intervene." [Doc.170_at_12]. And in

considering the further allegations in the amended complaint, the court held that plaintiffs' additional nonpublic evidence showing that Advantage did not actually exist as a business or otherwise operate as a wireless services company during the post-licensing period did not materially add to the information available to the public. [Doc.189_at_8].

First, even on that cramped understanding, plaintiffs' nonpublic evidence from its investigations and surveillance materially added to the public information. Second, the district court neglected plaintiffs' expertise and substantial efforts to uncover the fraud as "independent knowledge" that "materially adds" to the transactions disclosed in facially innocuous public documents. Even this Court's pre-amendment case law required that inquiry. *Springfield Terminal*, 14 F.3d at 657.

1.    The district court recognized that plaintiffs' independent evidence included: (1) In the six years since the licenses were awarded, Advantage has never had a legitimate place of business; employed anyone, or conducted itself in any way as if it were a business, [Doc.174¶¶87-88, 118-22, 133]; (2) Advantage's bidding was conducted from King Street's offices, and under the control of USCC and DiNardo/King Street, [Doc.174¶¶89, 92]; (3) USCC hired experts to

educate Vail on the mechanics of placing bids, [Doc.174¶90]; (4) one of the two Advantage designated bidders was a King Street employee with no known relationship with, or duty to, Advantage and controlled by DiNardo, [Doc.174¶91]; (5) Advantage and USCC entered into and concealed their agreement to transfer the licenses to USCC, [Doc.174¶103]; and (6) under that undisclosed agreement, Advantage has transferred *de facto* control of the licenses to USCC, [Doc.174¶¶124-28]. *See* [Doc.189_at_9-10].

This evidence did not merely confirm publicly available information that "Advantage had no customers," had "not constructed any equipment," and that "[USCC] and King Street Wireless would assist Advantage in the conduct [sic] the bidding activities." *Contra* [Doc.189_at_10]. And the allegations of a disqualifying secret leasing agreement between King Street and USCC did not merely confirm the publicly available information that was in the fictitious *non-disqualifying* 2012 version USCC summarized for the FCC. *Contra* [Doc.189_at_7-8].

Rather, this evidence was critical to exposing Advantage's filings as false, misleading, and fraudulent. Plaintiffs' independent knowledge provided *evidence* (not just allegations) that USCC and DiNardo

controlled Advantage's bidding in Auction 97, contradicting the false certifications that Vail had sole authority to determine which licenses to bid on. [Doc.174¶45] (citing 47 C.F.R. § 1.2110(c)(5)(viii) (affiliation arises "where one concern shares office space and/or employees and/or other facilities with another concern, particularly where such concerns are in the same or related industry or field of operations")); *see In re Application of Baker Creek Commc'ns, L.P.*, 13 FCC Rcd. 18709, 18720-21 (Sept. 22, 1998) (finding that designated-entity applicant was controlled by non-qualified investor where, among other factors, auction bidding was conducted from investor's offices such that applicant did "not have unfettered access" to its own facilities). And the evidence supported the allegations that defendants secretly agreed to create Advantage as part of a conspiracy and scheme for USCC to acquire discounted licenses. Plaintiffs revealed that Advantage was never more than a paper company in an empty office with no phone number and no employees.

Without plaintiffs' discoveries, Advantage's facially innocuous FCC filings did not reveal themselves to be false and fraudulent, or that Advantage was not an independent designated entity controlled by Vail. As shown by the FCC's decision to deny SNR's and Northstar's

applications, this is precisely the kind of information "that is sufficiently significant or important that it would be capable of 'influenc[ing] the behavior of the recipient'—i.e., the government." *Reed*, 923 F.3d at 757 (holding that this "ordinarily will satisfy the materially-adds standard"). Plaintiffs "contribute[d] significant additional information to that which has been publicly disclosed so as to improve its quality." *Moore & Co.*, 812 F.3d at 306 (holding that this meets "materially adds" requirement).

Perhaps worse, the district court seriously erred in reasoning that the Government's nonintervention is relevant to whether plaintiffs' efforts materially added to the publicly accessible information. [Doc.170_at_12]. As other courts in this district have recognized, the Government's decision not to intervene is not even *admissible evidence* on the merits of a relator's case. *E.g.*, *United States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 22 (D.D.C. 2008) (nonintervention inadmissible as irrelevant of materiality prong). "In any given case, the government may have a host of reasons for not pursuing a claim." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006); *United States ex rel. Chandler v. Cook County*, 277 F.3d 969, 974 n.5 (7th Cir. 2002) (same), *aff'd*, 538 U.S. 119 (2003). "If

relators' ability to plead sufficiently the element of materiality were stymied by the government's choice not to intervene, this would undermine the purposes of the Act." *United States v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 836 (6th Cir. 2018).

The district court conflated the "materially adds" inquiry with its finding that the public documents already disclosed the fraud. Congress determined that a relator may be an "original source" of even fully, publicly disclosed frauds, by adding the second original source exception. Although the "question whether a relator's information 'materially adds' to disclosures will often overlap with whether the relator's allegations are substantially the same as those prior revelations," it "must remain conceptually distinct; otherwise, the original source exception would be rendered nugatory." *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 525 (6th Cir. 2020) (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211-12 (1st Cir. 2016)) (cleaned up).

This Court should decline to "collaps[e] the materially-adds inquiry into the substantially-the-same inquiry … absent clear evidence that Congress intended this surplusage." *Maur*, 981 F.3d at 525 (cleaned up). By minimizing the "materially adds" component, the district court gave

65

short shrift to the reasons Congress amended the public disclosure bar in 2010. This repeated the error that prompted Congress to amend the 1986 statute in the first place.

2.  Plaintiffs also qualify as original sources because their expertise in telecommunications law, and their efforts to sift through facially innocuous public documents from disparate sources, are "independent knowledge" that "materially adds" to what was publicly disclosed. Since they provided that information to the Government before filing this action, [Doc.174¶25], they are an original source.

Plaintiffs' knowledge "materially adds" to the publicly disclosed transactions by revealing an otherwise-hidden fraud. Materiality in this setting requires the relator to "bring something to the table that would add value for the government." *United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 831 (6th Cir. 2021) (quotation marks omitted); *see also Moore & Co.*, 812 F.3d at 306 ("additional information" materially adds "to that which has been publicly disclosed" if it "improve[s] its quality"); *Reed*, 923 F.3d at 757 (holding that "new information that is sufficiently significant or important that it would be capable of 'influenc[ing] the

behavior of['] … the government… ordinarily will satisfy the materially-adds standard") (quoting *Winkelman*, 827 F.3d at 211).

Naturally, the "materially adds" inquiry turns substantially on the nature of the public disclosures. When public disclosures clearly reveal fraud, it will be harder for a relator's knowledge to materially add to those allegations because the defendant's misconduct may be openly known. On the other hand, if the only information in the public domain is facially innocuous, then a relator who can spot fraud in those transactions is more likely to materially add to it. That principle is highly relevant in cases like this one, in which the qualifying public disclosures do not identify the fraud, and even government lawyers trained to review bidding and licensing applications failed to recognize it.

Accordingly, this Court should reaffirm that knowledge "materially adds" to publicly disclosed transactions if it enables the relator to identify a fraud that is not otherwise apparent. *Springfield Terminal*, 14 F.3d at 657. As the Ninth Circuit recently explained, "when the scattered qualifying public disclosures each contain a piece of the puzzle, but none shows the full picture," a relator may "fill[] the gaps by putting together the material elements of the allegedly fraudulent scheme." *Silbersher*, 76

67

F.4th at 857. That court's conclusion "that the qualifying public disclosures [t]here d[id] not disclose a combination of facts sufficient to permit a reasonable inference of fraud," *id.* at 856-67, applies with equal force to whether plaintiffs' allegations "materially add" to what was disclosed in the FCC and SEC filings cited by the court below.

The Seventh Circuit has similarly found that "a plaintiff might be an original source even though her knowledge of every isolated element of the fraud is based upon public disclosures"; specifically, "[i]n an exceptionally or unusually complicated allegation of fraud each piece of the information may be publicly disclosed, yet the fraud itself may remain hidden until some perspicacious plaintiff puts it in perspective." *United States v. Bank of Farmington*, 166 F.3d 853, 864 (7th Cir. 1999), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009).

The architect of the public disclosure bar made the same argument before Congress implemented the 2010 amendments, "forcefully … disagreeing with cases holding that *qui tam* suits are barred if the relator obtains some, or even all, of the information necessary to prove fraud from publicly available documents." 145 Cong. Rec. E1546-01, at *E1546.

68

Instead, relators who use "their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a *qui tam* action." *Ibid*.

The structure of the statute and the role the original source exception plays vis-à-vis the public disclosure bar reinforce that expertise can materially add to public disclosures. The original source exception applies *only* when the public disclosure bar has already been triggered, i.e., when all the material elements of the fraud have been publicly disclosed. For it to be meaningful, the original source exception must reach those situations. Because the original source exception applies *only* when the public disclosure bar has been triggered, the inquiries should not be construed to overlap so severely. *See, e.g.*, *Reed*, 923 F.3d at 757. Instead, the Court should recognize that Congress created space for knowledge that allows relators to proceed *even when* all the essential elements of a fraud have been publicly disclosed—and that such knowledge will often come in the form of expertise.

\* \* \*

The documents the district court relied on to dismiss this case were filed by Advantage to *support* its claim for designated-entity status.

69

Those filings presented Advantage as a viable company looking to participate in the wireless services industry as a very small business. Nothing in these disclosures revealed that Advantage was a front for USCC—a billion-dollar services provider—to expand its network by acquiring licenses with discounts for which USCC was not itself eligible.

To identify the fraudulent scheme hidden in the applications for benefits, plaintiffs reviewed information in different databases, analyzed hundreds of pages of filings and agreements, commissioned surveillance of the different office locations claimed by Advantage, interviewed witnesses firsthand, and searched for (and did not find) evidence that Advantage ever functioned as the company it claimed to be. Plaintiffs are the ideal relators in a case like this, and paradigmatic original sources.

## CONCLUSION

The district court's decision should be reversed.

Dated: October 2, 2023

Respectfully submitted,

/s/ Daniel Woofter

Sara M. Lord
James R. Wiseman
ARNALL GOLDEN GREGORY,
   LLP
2100 Pennsylvania Ave. NW
Suite 350S
Washington, DC 20006
(202) 677-4054
sara.lord@agg.com

Benjamin J. Vernia
THE VERNIA LAW FIRM
1455 Pennsylvania Ave. NW
Suite 400
Washington, DC 20004
(202) 349-4053
bvernia@vernialaw.com

Daniel Woofter
GOLDSTEIN, RUSSELL &
   WOOFTER, LLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 240-8433
dhwoofter@goldsteinrussell.com

*Attorneys for Plaintiffs-
Appellants Mark J. O'Connor
and Sara F. Leibman*

71

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

31 U.S.C. § 3729.................................................................2

31 U.S.C. § 3730(b)............................................................6

31 U.S.C. § 3730(e)(4).......................................................8

31 U.S.C. § 3730(e)(4) (1986)...........................................8

---

## 31 U.S.C. § 3729, False Claims

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

> (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the

A2

Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(2) Reduced damages. If the court finds that

(A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B) such person fully cooperated with any Government investigation of such violation; and

(C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.

A3

A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions. For purposes of this section

(1) the terms "knowing" and "knowingly"

> (A) mean that a person, with respect to information

>> (i) has actual knowledge of the information;

>> (ii) acts in deliberate ignorance of the truth or falsity of the information; or

>> (iii) acts in reckless disregard of the truth or falsity of the information; and

> (B) require no proof of specific intent to defraud;

(2) the term "claim"

> (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that

>> (i) is presented to an officer, employee, or agent of the United States; or

>> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government

>>> (I) provides or has provided any portion of the money or property requested or demanded; or

A4

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

(c) Exemption from disclosure.

Any information furnished pursuant to subsection (a)(2) shall be exempt from disclosure under section 552 of title 5.

(d) Exclusion.

This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986.

**31 U.S.C. § 3730(b)**

(b) Actions by private persons.

    (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

    (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure.1 The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

    (3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

    (4) Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall—

        (A) proceed with the action, in which case the action shall be conducted by the Government; or

        (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

(5) When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

**31 U.S.C. § 3730(e)(4)**

(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

> (iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

---

**The version of 31 U.S.C. § 3730(e)(4), as amended in 1986, read:**

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the

information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7) because it contains 13,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook LT Std.

Dated: October 2, 2023                    /s/ Daniel Woofter_____
                                           Daniel Woofter

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2023, I caused this document to be electronically filed with the Clerk of Court by using the electronic filing system, which will send a notice of electronic filing to all parties who have registered with the electronic filing system.

Dated: October 2, 2023          /s/ Daniel Woofter_____
Daniel Woofter